# 23-0454-cv

## United States Court of Appeals

*for the*

## Second Circuit

ROBERT FERRARA,

*Plaintiff-Appellant,*

— v. —

STERLING, INC., DBA Kay Jewelers,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

STEVEN J. LUCKNER
ALEXANDER W. RAAP
OGLETREE, DEAKINS, NASH, SMOAK
   & STEWART, P.C.
*Attorneys for Defendant-Appellee*
10 Madison Avenue, Suite 400
Morristown, New Jersey 07960
(973) 656-1600

CP COUNSEL PRESS    (800) 4-APPEAL • (323790)

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Respondent Sterling Inc. d/b/a Kay Jewelers ("Kay" or the "Company") states as follows: Sterling Jewelers Inc. is an indirect wholly owned subsidiary of Signet Jewelers Ltd., which is a publicly traded company on the New York Stock Exchange. There are no other publicly traded companies that own 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...................................................................iv

JURISDICTIONAL STATEMENT ........................................................1

COUNTERSTATEMENT OF ISSUES PRESENTED FOR REVIEW ..................1

STATEMENT OF RELATED CASES ....................................................2

COUNTERSTATEMENT OF THE CASE................................................2

RELEVANT FACTS ............................................................................3

    A.    Ferrara's Tenure as District Manager Under Joe Gifford ....................4

    B.    Ferrara's Tenure as District Manager Under Christopher Gullo ............................................................................8

    C.    Ferrara is Demoted ..........................................................11

    D.    Ferrara E-mails Human Resources After His Demotion ....................13

    E.    The Company Approves Ferrara's Request for Medical Leave and Grants his Accommodation Request ...........................................14

    F.    Ferrara's March 20, 2018 Complaint with the New York State Division of Human Rights and Equal Employment Opportunity Commission ...................................................15

    G.    July 23, 2018 Employee Counseling Report......................................16

    H.    Ferrara Resigns from the Company ...................................17

    I.    Ferrara's May 2, 2019 Complaint with the New York State Division of Human Rights and Equal Employment Opportunity Commission ...................................................18

PROCEDURAL HISTORY................................................................19

RULINGS PRESENTED FOR REVIEW ...............................................20

STANDARD OF REVIEW ................................................................20

SUMMARY OF THE ARGUMENT ....................................................22

LEGAL ARGUMENT ...........................................................................................23

    POINT I

    THE COURT APPLIED THE CORRECT STANDARD OF
    REVIEW WHEN IT DISMISSED FERRARA'S HOSTILE WORK
    ENVIRONMENT CLAIM ...........................................................................23

    POINT II

    FERRARA HAS NOT DEMONSTRATED THAT ANY
    ALLEGED COMMENTS WERE SEVERE OR PERVASIVE
    ENOUGH TO VIOLATE THE NYHRL AND ADEA ................................25

    1.    Gullo's Alleged Comments Were Stray Remarks That Do Not
        Constitute Age Discrimination............................................................27

    2.    Kay Would Be Entitled to the *Faragher/Ellerth* Defense
        Because Kay Took Remedial Action by Not Assigning Gullo
        to Supervise Ferrara After His Untimely Complaint .........................32

    POINT II

    FERRARA'S RETALIATION CLAIM ALSO FAILS BECAUSE
    KAY EXERCISED ITS OWN REASONABLE BUSINESS
    JUDGMENT BY DEMOTING HIM AFTER YEARS OF POOR
    JOB PERFORMANCE..................................................................................35

    A.    Kay Had a Legitimate Business Reason for Demoting Ferrara..........35

CONCLUSION .................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alfano v. Costello*,
   294 F.3d 365 (2d Cir. 2002) .................................................................. 26, 27

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)............................................................................ 20, 22

*Bunk v. General Services Admin.*,
   408 F. Supp. 2d 153 (W.D.N.Y. 2006)....................................... 27, 28, 30

*Burlington Indus., Inc. v. Ellerth*,
   524 U.S. 742 (1998).....................................................................................33

*Cadet v. Long Island Coll. Hosp.*,
   No. 97-CV-1905, 1999 U.S. Dist. LEXIS 23582 (E.D.N.Y. July 9, 1999) .........36

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)............................................................................ 20, 21

*Danzer v. Norden Sys., Inc.*,
   151 F.3d 50 (2d Cir. 1998) ........................................................................38

*Davis-Garett v. Urb. Outfitters, Inc.*,
   921 F.3d 30 (2d Cir. 2019) ............................................................ 27, 28, 29

*De la Cruz v. City of New York*,
   783 F. Supp. 2d 622 (S.D.N.Y. 2011) ....................................................... 35, 36

*Doe v. Syracuse Univ.*,
   457 F. Supp. 3d 178 (N.D.N.Y. 2020)...................................................21

*Duplan v. City of New York*,
   888 F.3d 612 (2d Cir. 2018) ....................................................................36

*Faragher v. City of Boca Raton*,
   524 U.S. 775 (1998)......................................................................... 32-33

*Ferrara v. Kellwood Co.*,
   440 F.3d 96 (2d Cir. 2006) ....................................................................... 32, 34

*Gambello v. Time Warner Commc'ns, Inc.*,
   186 F. Supp. 2d 209 (E.D.N.Y. 2002) ..................................................36

*Gregory v. Daly*,
    243 F.3d 687 (2d Cir. 2001) ...............................................................26

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993)...............................................................................27

*In re Motors Liquidation Co.*,
    590 B.R. 39 (S.D.N.Y. 2018)..............................................................20

*Ingrassia v. Health & Hosp. Corp.*,
    130 F. Supp. 3d 709 (E.D.N.Y 2015) .................................................27

*Jeffreys v. City of New York*,
    426 F.3d 549 (2d Cir. 2005) ...............................................................22

*JP Morgan Chase Bank v. Altos Horno de Mexico, S.A. de C.V.*,
    412 F.3d 418 (2d Cir. 2005) ...............................................................20

*Kassner v. 2nd Ave. Delicatessen Inc.*,
    496 F.3d 229 (2d Cir. 2007) ....................................................... 28, 29

*Larsen v. NMU Pension Trust of NMU Pension & Welfare Plan*,
    902 F.2d 1069 (2d Cir. 1990) .............................................................20

*Lively v. WAFRA Investment Advisory Group, Inc.*,
    6 F.4th 293 (2d Cir. 2021) ..................................................................38

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................21

*Naumovski v. Norris*,
    934 F.3d 200 (2d Cir. 2019) ...............................................................38

*Perry v. Ethan Allen, Inc.*,
    115 F.3d 143 (2d Cir. 1997) ...............................................................27

*Remy v. Marriott Int'l, Inc.*,
    952 F.3d 379 (2d Cir. 2020) ...............................................................27

*Revere v. Bloomingdale's, Inc.*,
    No. 03-CV-5043 (E.D.N.Y. Nov. 14, 2006)........................................36

*Rexnord Holdings, Inc. v. Bidermann*,
    21 F.3d 522 (2d Cir. 1994) .................................................................21

*Rosenfield v. New York State Div. of Veterans' Affairs*,
    2019 U.S. Dist. LEXIS 162633 (N.D.N.Y. Sept. 24, 2019).................26

*Saenger v. Montefiore Med. Ctr.*,
    706 F. Supp. 2d 494 (S.D.N.Y. 2010) ....................................................36

*Scaria v. Rubin*,
    17 F.3d 652 (2d Cir. 1997) ..................................................................36

*Scotto v. Almenas*,
    143 F.3d 105 (2d Cir. 1998) ................................................................21

*Univ. of Texas S.W. Medical Ctr. v. Nassar*,
    570 U.S. 338 (2013)............................................................................35

*Wheeler v. Bank of N.Y. Mellon*,
    2018 U.S. Dist. LEXIS 131456 (N.D.N.Y. Aug. 6, 2018) ...................26

**Statutes & Other Authorities:**

Fed. R. App. P. 26.1 ...................................................................................1

Fed. R. Civ. P. 56(A) ...............................................................................20

N.Y. Exec. Law, Article 15........................................................................18

<u>**JURISDICTIONAL STATEMENT**</u>

Kay accepts Plaintiff-Appellant Robert Ferrara's ("Ferrara") Jurisdictional Statement.

<u>**COUNTERSTATEMENT OF ISSUES PRESENTED FOR REVIEW**</u>

1.      Where the district court analyzed both the severity and pervasiveness of Mr. Gullo's alleged comments, did the district court review Ferrara's age-based hostile work environment claim under a "severe or pervasive" standard?

2.      Where Ferrara did not produce evidence that any alleged comments made toward him affected his ability to perform his job duties, did Ferrara create a genuine issue of material fact to demonstrate that he was subject to an age-based hostile work environment?

3.      Where Ferrara had failed to meet Kay's performance standards for several years, did Kay have a legitimate business reason to demote Ferrara?

## STATEMENT OF RELATED CASES

There are no other cases or proceedings related to this matter.

## COUNTERSTATEMENT OF THE CASE

Ferrara ostensibly alleges that he was subject to a hostile work environment based upon his age in violation of the Age Discrimination and Employment Act ("ADEA") and the New York Human Rights Law ("NYHRL"), and subsequently retaliated against for complaining about that alleged hostile work environment. However, there is no evidence to demonstrate that Ferrara ever was subject to a hostile work environment, or that he was ever retaliated against for any complaints about an alleged hostile work environment. Instead, it is undisputed that Kay demoted Ferrara after failing to meet Company performance standards for over three (3) years.

Ferrara argues that his one-time supervisor, Christopher Gullo ("Gullo") created a hostile work environment because of his alleged use of purported age-based comments toward him. However, Ferrara has produced **no** evidence that these comments were severe or pervasive enough to alter the conditions of his job or affect his job performance. Instead, Ferrara was a poor performer under several supervisors, and he did not complain about Gullo until **after** he received notice of his demotion. As the District Court held, Ferrara offered no evidence that would support a jury determination in his favor as to the adequacy of his argument that he

was subjected to an age-based hostile work environment in violation of the ADEA or NYHRL.

Similarly, Ferrara's retaliation claim fails because Ferrara cannot refute Kay's argument that it exercised reasonable business judgment to demote him because he had an extensive history of failing to meet Company sales expectations under multiple supervisors, especially when the demotion came before his complaint. Ferrara's attempt to cherry-pick a few unrelated awards he received during his entire employment history is merely an attempt to distract the Court from the reality that he performed his job responsibilities poorly despite receiving numerous warnings and deficient evaluations. Ferrara never challenged those performance reviews, and even commented on those reviews acknowledging he could improve his performance. Kay exercised reasonable business judgment to demote Ferrara because of his years of poor job performance and demonstrated inability to lead one of Kay's districts of stores.

As such, this Court should affirm the District Court's grant of summary judgment and dismissal of all counts of Ferrara's Complaint.

## RELEVANT FACTS

Kay is an indirect wholly owned subsidiary of Signet Jewelers Ltd. ("Signet"), which operates as a retailer of diamond jewelry. (Ja011.) Kay operates as a division of Sterling in the United States. (Ja018-019.) Zale Delaware Inc., is also an indirect

wholly owned subsidiary of "Signet", which operates as a retailer of diamond jewelry including doing businesses under the name, Zales ("Zales"). (*Id.*) Ferrara is a former employee who worked for the Company as a store manager beginning in July 2003 and until 2007. (Ja023).

In or about 2001, JoAnn Falta ("Falta") and Jim Mix began meeting with Ferrara about joining Kay while he worked for another jewelry company. (Ja021-022). Ferrara accepted an opportunity with the Company and became a store manager in July 2003, and then later entered the district manager training program. (*Id.*; *see also* Ja0023). Ferrara reported to Falta when he participated in the training program. (*Id.*; *see also* Ja022). Ferrara remained in his store manager position while completing the district manager program. (Ja024.) Ferrara then left the Company to begin working for Ultra as a district manager in 2007 and remained there until it was acquired by the Company in 2013. (Ja024-025.) However, due to performance issues, Ferrara was demoted to store manager effective September 3, 2017. (Ja034.) Ferrara subsequently resigned from his employment with the Company on August 9, 2018. (Ja032.)

## A. Ferrara's Tenure as District Manager Under Joe Gifford

When Ferrara returned to Kay in 2013, his supervisor was Joe Gifford ("Gifford"), who served as a vice president. (Ja026.) Ferrara's long-standing history of performance issues were noted by the Company as early as February 2, 2014 when

Gifford completed a Performance Appraisal for Ferrara's work from June 2, 2013 to February 1, 2014. (Ja037-041.) Gifford indicated in this Performance Appraisal that Ferrara "must get his team focused on standard performance and achievement. He must make more timely decisions in order to maximize performance and continue to grow business and career." (*Id.*) Ferrara's sales production for his district was 7.3% below plan expectations. (*Id.*) Ferrara acknowledged that he received the February 2014 Performance Appraisal because he executed his signature and has never challenged its validity. (*Id,*)

Gifford completed another Performance Appraisal for Ferrara on August 2, 2014, which assessed Ferrara's job performance from February 2014 through July 2014. (Ja042-046.) Gifford identified similar issues with Ferrara's performance, noting that he "must continue to develop as a valuable resource for [S]terling so that his team can thrive. [Ferrara] must also develop a strategic plan for his district in order to gain commitment from team and peers. These areas of growth will surely improve job satisfaction." (*Id.*) Ferrara's sales production for his district at the time of the August 2014 Performance Appraisal was 6.7% below plan expectations. (*Id.*) Ferrara acknowledged that he received the July 2014 Performance Appraisal because he signed it and has never challenged its validity. (*Id.*)

On January 6, 2015, Ferrara received a Team Member Counseling Report that emphasized that Ferrara would need to improve his district's performance statistics.

(Ja047-049.) The January 2015 Counseling Report stated that it "is a District Manager's objective to achieve a minimum of 100% of Sales Goals and achieve all 6 performance standards." (*Id.*) However, Ferrara only received a 91.86% for his sales goals, and only achieved a "2/6 in achieving minimum performance standards. This level of performance is [u]nacceptable." (*Id.*) Ferrara was advised that he "must adhere to the above standards immediately. Any future performance issues will result in further disciplinary action up to and including termination." (*Id.*) Ferrara acknowledged he received the January 2015 Counseling Report because he executed his signature on it and has never challenged its validity. (*Id.*)

On January 31, 2015, Ferrara received a Performance Appraisal which assessed his job performance from August 2014 to January 2015. (Ja050-054.) The January 2015 Performance Appraisal highlighted that "[Ferrara's] sales were the lowest in the region and his standards performance was unacceptable. [Ferrara] must refine his practices in effort to meet expectations." (*Id.*) Ferrara's sales production for his district was also below plan expectations by 8.48%. (*Id.*) Ferrara acknowledged he received the January 2015 Performance Appraisal because he executed his signature and has never challenged its validity. (*Id.*)

On August 1, 2015, Ferrara received a Performance Appraisal which assessed his job performance from February 2015 through July 2015. (Ja055.) The August 2015 Performance Appraisal noted that Ferrara "must improve on managing the

details." While Ferrara "does a good job of inspiring recruiting and development . . . he must improve his managing the steps expected by Signet. These teaching vehicles lead to store competency and performance, only 6/13 stores over plan YTD." (*Id.*) Additionally, the August 2015 Performance Appraisal stated that Ferrara "supports our core values and creates a positive environment," however, he "must focus all energy in standards production, people development and delivering results." (*Id.*) Ferrara's performance goals still had not been met because his district's sales production was 1.3% below plan expectations. (*Id.*) Ferrara acknowledged that he received the August 2015 Performance Appraisal because he executed his signature and has never challenged its validity. (*Id.*)

On September 2, 2015, Ferrara received a Team Member Counseling Report highlighting that his district had "[u]nacceptable [d]istrict sales performance YTD through the first six month[s] of the fiscal year. The Ferrara Sales are -1.3% behind plan." (Ja066-068.) Ferrara himself acknowledged that he understood his "district is down in sales -1.3% YTD." (*Id.*) The Counseling Report noted that he needed to "[b]uild necessary action plans, implement those actions, hold team and self accountable in order to achieve District sales results by year end." (*Id.*) Ferrara acknowledged that he received the September 2015 Counseling Report because he executed his signature and has never challenged its validity. (*Id.*)

On January 30, 2016, Ferrara received a Performance Appraisal which assessed his job performance from July 2015 to January 2016. (Ja069-074.) Unlike his prior performance evaluations, Ferrara began to show signs of improvement because his district was 3.0% above its sales production plan expectation. (*Id.*) The January 2016 Performance Appraisal indicated that Ferrara "must continue to develop his analytic thinking and spend more focus on individual performance stats." (*Id.*) Ferrara acknowledged that he received the January 2016 Performance Appraisal because he executed his signature and has never challenged its validity. (*Id.*)

## B. Ferrara's Tenure as District Manager Under Christopher Gullo

Gifford remained as Ferrara's supervisor up until 2016. (Ja026.) In or around 2016, Christopher Gullo ("Gullo") became Ferrara's supervisor after Gifford retired. (*Id.*) Gullo remained as Ferrara's supervisor until Ferrara's demotion in September 2017. (*Id.*) However, Ferrara's performance issues re-emerged even after he received the positive report during the January 2016 Performance Appraisal, evidencing that Ferrara was unable to build upon his limited progress. (Ja069-074.)

On November 8, 2016, Ferrara received a Team Member Counseling Report prepared by Gullo which stated that the "district is currently not achieving." (Ja075-077.) Ferrara's district did not meet its expected sales objective because through November 5, 2016, his district was only at 94.60% out of 100%. (*Id.*) Ferrara's

district also was brought down as a result of 10 of 15 stores being below 100% sales goals, and it only achieved minimum sales expectations in February, March, and September of 2016. (*Id.*) Ferrara's district had only "achieved or exceeded sales plan in only 6 of the past 26 weeks." (*Id.*) Gullo emphasized in the November 2016 Counseling Report that Ferrara "must lead his team to achieve and exceed the company's minimum sales expectation. Time management is a must to lead the team. He must teach, train and follow up on the behaviors that are proven to lead to sales success." (*Id.*) Ferrara himself acknowledged that he and Gullo "discussed some strategic plans that [he] understand[s]" and that he would "put into place the coaching ASAP." (*Id.*) Ferrara acknowledged that he received the November 2016 Counseling Report because he executed his signature and has never challenged its validity. (*Id.*)

Ferrara also failed to meet Company expectations by the time he received the January 28, 2017 Team Member Counseling Report. (Ja078-080.) Ferrara's district completed the 2017 fiscal year at only 93.51% out of the expected 100% sales goal. (*Id.*) Ferrara's district failed to meet Company expectations as 9 out of the 15 stores in Ferrara's district were below 100% year to date. (*Id.*) Ferrara's district had only achieved minimum sales expectations in 3 of the 12 months of fiscal year 2017. (*Id.*) Gullo indicated that Ferrara must "teach, train and follow up on the behaviors that are proven to lead to sales success" and that if Ferrara performed those tasks, it

would "lead to sales the district is currently not achieving." (*Id.*) Gullo also stated that Ferrara "must establish a continual recruiting plan, follow up with all training completed and hold all team members accountable to the minimum company expectations." (*Id.*) The January 2017 Counseling Report stated that Ferrara "must adhere to the above standards immediately" and that any "future performance issues will result in further disciplinary action up to and including termination." (*Id.*) Ferrara acknowledged that he received the January 2017 Counseling Report because he executed his signature and never challenged its validity. (*Id.*)

Ferrara's performance issues persisted through May 2017 when he received an Employee Counseling Report on May 27, 2017. (Ja081-083.) Ferrara's district failed to improve because only 5 of his 14 stores were above the minimum sales expectation. (*Id.*) Ferrara's district, as a whole, only achieved 84.54% of its 100% sales expectations. (*Id.*) The May 2017 Counseling report indicated that Ferrara's district failed to meet Company expectations in Fiscal Years 2015 and 2017, and exceeded it by the end of Fiscal Year 2016. (*Id.*) Ferrara's succession planning was also deficient because 6 of the 12 managers, and 8 of the 13 assistant managers were "below sales standard YTD" and that he had "consistently underperforming leadership and sales positions [that] are not supported by a qualified team member bench to take timely action on performance management needs." (*Id.*)

Gullo noted that Ferrara's district did not meet expectations because this "level of sales productivity and succession management is unacceptable. Based on [his] experience level, knowledge and this District's business flow, sales plan and standards are attainable and expected, supported by an effective and consistent recruiting and succession plan." (*Id.*) Ferrara was advised that he needed to maintain "sales and standards at or above corporate minimum expectation on a weekly and monthly basis" and that his failure "to perform role responsibilities will result in further disciplinary action up to and including separation or demotion from current District Manager position." (*Id.*) Gullo noted that he "will conduct a formal follow up on . . . 6/26/17 to review June and YTD sales results" and that Ferrara "must send a weekly update regarding team member development and recruiting results starting on 06/06/17." (*Id.*) Ferrara acknowledged that he received that May 2017 Counseling Report because he executed his signature on it and never challenged its validity. (*Id.*)

## C.  <u>Ferrara is Demoted</u>

On or around the end of August 2017, Kay demoted Ferrara to Store Manager, effective September 3, 2017, due to his long-standing and well-documented history of not meeting Company sales expectations. (Ja027-028; *see also* Ja035-036.) The decision-makers behind Ferrara's termination were Jennifer Hammond ("Hammond"), Kay's Vice President of Divisional Operations, Brian Watson

("Watson"), Kay's Human Resources Business Partner, and Gullo. (*Id.*; *see also* Ja256-258.)  The Company stated that he "has not been effective in his role as District Manager and his district's performance is not meeting company standards." (Ja035-036.)  Ferrara's district was ranked "7 of 8 for the overall top line sales at 88.90 YTD and he is 3 for 6 with only 3 of 14 stores making plan.  The district ranked lower than [Ferrara] is being led by a DM who has only been in role less than 3 weeks."  (*Id.*)

Ferrara was advised that he was to serve as a Store Manager for a Zales store in Albany, New York.  (Ja027.)  The Company then sent Ferrara to begin training in Glens Falls, New York to learn Zales' technology; however, Ferrara claims he did not regularly participate in training because he would be notified that a "district was not doing well and every day there wasn't a manager showing up at a store and they would ask me to go cover the store and open the store for one of the Zales stores." (*Id.*)  Susan Bishop served as Ferrara's supervisor during his two-week tenure with Zales.  (*Id.*)  Ferrara then claims that Falta contacted him after his two week tenure with Zales to return to Kay's and become a Store Manager at the Crossgates Mall beginning in or around October 2017.  (*Id.*)

Falta served as Ferrara's supervisor when he rejoined Kay.  (Ja028.)  Falta's supervisor at the time that Ferrara rejoined Kay was Steve Martz ("Martz"), who served as a regional vice president.  (*Id.*)  In or around October 2017, Ferrara claims

the Company announced that it would be conducting a realignment of their lines of supervision and that Gullo was supposed to take over Martz's position as Falta's supervisor. (*Id.*) Notably, Gullo never had any supervisory role over Falta or Ferrara after Ferrara's demotion. (*Id.*) On or about February 2018, Gullo resigned from the Company to take another opportunity. (*Id.*)

### D. Ferrara E-mails Human Resources After His Demotion

Up until Ferrara's demotion, he had never filed a complaint with the Company's Human Resources Department ("HR") alleging that he was the victim of any misconduct by another supervisor or co-worker. (Ja029-030.) Specifically, he never provided anyone with notice of any alleged harassment by Gullo until **after** his demotion. (*Id.*) Additionally, Ferrara testified that no other employees, including Hammond or Watson, ever made any age-based comments toward him. (Ja032-033.) Ferrara claims he attempted to contact Watson, who served as Gullo's regional HR manager, a week before his demotion to learn how to "communicat[e] with Gullo." (Ja029-030.) However, Ferrara did not speak with Watson until after his demotion. (Ja029.) Additionally, the Company offers a hotline for its employees to report any alleged harassment that connects employees with regional HR vice presidents; however, Ferrara did not contact the hotline. (*Id.*) Accordingly, even if Ferrara had called the hotline, Gullo could not have been aware because he was not a member of the Human Resources team. (*Id.*)

Ferrara did not communicate with anyone in HR until e-mailing Kazem Moghtader ("Moghtader") on September 1, 2017. (Ja084-087.) Ferrara did not include any allegations of harassment in his initial e-mail and only requested an investigation into his demotion. (*Id.*) Ferrara eventually spoke with Moghtader concerning his allegations and identified several individuals who may have relevant knowledge; however, HR ultimately concluded that there was no discriminatory intent motivating Ferrara's demotion after completing an investigation. (Ja030.) One of Ferrara's communications with Moghtader was an e-mail outlining his allegations against Gullo, where Ferrara alleged that Gullo called him a "dinosaur," told him he was "hatched," that he did not know what it was like to be a "modern day" manager," and a variety of other accusations he claimed supported his argument that he was demoted because of his age. (Ja088.) Notably absent from Ferrara's e-mail to Moghtader was any reference to his long-standing and well-documented history of poor performances that did not meet Company expectations. (*Id.*)

## E. The Company Approves Ferrara's Request for Medical Leave and Grants his Accommodation Request

On or around February 9, 2018, Ferrara requested and was granted medical leave by the Company in compliance with the Family and Medical Leave Act. (Ja090-091.) Ferrara was granted medical leave for the period from February 4, 2018 through April 1, 2018. (*Id.*) Dr. Nagaraja Patil, M.D. ("Dr. Patil") supported

Ferrara's request for medical leave and stated that Ferrara was unable to perform "[a]ll job functions at the present time" and that Ferrara suffered from: (1) anxiety; (2) depression; and (3) "PTS." (Ja092-098.) On or around March 1, 2018, Dr. Patil subsequently requested an extension of Ferrara's medical leave until April 29, 2018. (Ja099-100.) On or around March 9, 2018, the Company granted Ferrara's request for an extension of medical leave until April 29, 2018. (Ja101-102.) On or around April 17, 2018, Dr. Patil certified that Ferrara would be physically able to return to work on April 29, 2018, so long as he would only be required to work 40 hours per week and only be required to work 5 days a week until May 31, 2018. (Ja103-104.) On or around June 8, 2018, the Company granted Ferrara's request to only work 40 hours a week and only be required to work 5 days a week and extended it from April 29, 2018 until July 31, 2018. (Ja105-106; *see also* Ja031.)

**F.      Ferrara's March 20, 2018 Complaint with the New York State Division of Human Rights and Equal Employment Opportunity Commission**

On or around March 20, 2018, Ferrara filed a complaint with the New York State Division of Human Rights ("NYSDHR") and the Equal Employment Opportunity Commission ("EEOC") against the Company. (Ja107-109.) On November 29, 2019, the NYSDHR issued a Determination and Order of Dismissal for Administrative Convenience. (*Id.*) Ferrara never filed an appeal of the

NYSDHR's November 2019 Dismissal Order.  (*Id.*)  Likewise, on August 4, 2020, the EEOC also dismissed Ferrara's Complaint.  (Luckner Cert. Ex. X.)

### G.  July 23, 2018 Employee Counseling Report

1.  On or around April 29, 2018, Ferrara returned to continue working as a Store Manager.  (Ja031.)  On July 23, 2018, Ferrara received an Employee Counseling Report from Falta indicating that his performance as a Store Manager, like his performance as District Manager, failed to meet Company expectations.  (Ja113-116.)  Falta, who was now serving as his supervisor, indicated that she was "concerned with [his] level of leadership . . . specifically with the execution and delivery of company Performance Objectives and Standards."  (*Id.*)  Falta stated that Ferrara was not meeting Company expectations because his "store [was] at 87% [YTD] with your personal sales at 60% to total sales, [and] 0 of 5 standards . . ." (*Id.*)  Falta indicated that she discussed with Ferrara at the "beginning of May [2018] . . . the importance of your store's sales plan along with what you would do to meet the expected standards."  (*Id.*)

Ferrara needed to "make significant changes immediately in order to impact July and August sales results and Standard performance" and that he needed to "demonstrate leadership, the ability to execute to company standards, and the ability to develop and hold your teams accountable for results."  (*Id.*)  Falta noted that she would "continue to support [Ferrara] around all the performance expectations,

however, [his] current performance requires immediate attention and sustained improvement." (*Id.*) Ferrara provided comments to the July 2018 Counseling Report by stating that he had "spent hours upon hours protecting the Company assets to help resolve all of the issues" caused by a former assistant manager being terminated due to fraudulent misconduct. (*Id.*) Notably absent from Ferrara's narrative is any reference to his desire to improve on his own personal performance and willingness to meet Company expectations. (*Id.*) Ferrara acknowledges that he received the July 2018 Employee Counseling Report because he executed his signature on it and never challenged its validity. (*Id.*)

### H. Ferrara Resigns from the Company

On or around August 9, 2018, Ferrara resigned from the Company. (Ja032-033.) Gullo had not been an employee with the Company since February 2018, nor had he been Ferrara's supervisor since his demotion in September 2017. (*Id.*) However, Ferrara claimed that he had resigned from the Company due to the "mental[]" and "physical[]" effects of Gullo's alleged comments about Ferrara's age, as well the alleged stress of the decrease in salary Ferrara incurred resulting from his demotion. (*Id.*) Ferrara admitted that no one but Gullo "made those comments." (*Id.*) Ferrara also claims that he suffered from stress because he believed the Company was seeking to replace him with another employee; however, he acknowledges that "[w]hether or not that's true, I don't know." (*Id.*)

# I. **Ferrara's May 2, 2019 Complaint with the New York State Division of Human Rights and Equal Employment Opportunity Commission**

Ferrara subsequently filed a second Complaint to the NYSDHR and EEOC alleging that the Company committed an "unlawful discriminatory practice relating to employment because of age, opposed discrimination/retaliation, disability in violation of N.Y. Exec. Law, art. 15 (Human Rights Law)." (Ja117-120.) Ferrara litigated his claims before the NYSDHR; however, the NYSDHR issued a dismissal because it held there was "insufficient evidence to support the allegations of discrimination because of age, opposed discrimination/retaliation, or disability." (*Id.*)

Most importantly, the NYSDHR held that "[o]ther than [Ferrara's] assertions, the investigation revealed no evidence of discriminatory animus." (*Id.*) The NYSDHR noted that the Company "has remained consistent in their evaluation of [Ferrara]" and that a review of Ferrara's records concludes that he had a "poor evaluation, mainly about the performance of the store" which "predated [Ferrara's] complaints of discrimination by 3 years. This strongly implies that [Ferrara] was given the poor evaluations due to the issues found with the store and not as a form of retaliation for his previously filed complaint with the [NYSDHR or EEOC]." (*Id.*) The NYSDHR also held that while Ferrara "did not find having his work criticized pleasant; this [is] not enough to rise to the level of workplace hostility needed for a

constructive discharge claim." (*Id.*) Ferrara similarly never filed an appeal of the NYSDHR's decision. (*Id.*) On February 26, 2020, the EEOC adopted the NYSDHR's decision. (Ja121-124.)

## PROCEDURAL HISTORY

Ferrara commenced this lawsuit in the United States District Court for the Northern District of New York on April 27, 2020. (Ja002). On July 6, 2020, Kay filed their Answer to the Complaint. (Ja003). On September 3, 2020, Ferrara filed an Amended Complaint. (Ja004; *see also* Ja245). Ferrara alleged the following four causes of action: (1) a hostile work environment claim based on age in violation of the NYHRL and ADEA; (2) retaliation in violation of the NYHRL and ADEA; (3) constructive discharge in violation of the NYHRL; and (4) disability discrimination in violation of the NYHRL and ADA. (Ja254). On September 17, 2020, Kay filed its Answer to the Amended Complaint. (Ja004).

On April 18, 2022, Kay filed a Motion for Summary Judgment against Ferrara seeking dismissal of all of his claims raised in his First Amended Complaint. (Ja009-010). On March 16, 2023, the District Court entered an Order granting Kay's Motion for Summary Judgment as to all four of Ferrara's claims raised in his First Amended Complaint. (Ja262-287). Ferrara subsequently filed this appeal challenging the District Court's ruling solely as to two of his claims – his hostile work environment and retaliation claims. (Ja261).

## RULINGS PRESENTED FOR REVIEW

Ferrara appeals the District Court's ruling dismissing his hostile work environment and retaliation claims in violation of the NYHRL and ADEA.[1]

## STANDARD OF REVIEW

This Court exercises plenary review of orders granting summary judgment. *Larsen v. NMU Pension Trust of NMU Pension & Welfare Plan*, 902 F.2d 1069, 1073 (2d Cir. 1990). Summary judgment should be granted where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, when viewed with all reasonable inferences drawn in favor of the non-moving party, demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. Pro 56(A). A "genuine" issue of material fact is one which might actually change the outcome of the proceeding. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment bears the initial burden of showing that it is entitled to summary judgment. *Id.* (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). This showing can be made either by demonstrating that there is no genuine issue of material fact and thus, as a matter of law, the moving party must

---

[1] Ferrara does not challenge the District Court's grant of summary judgment and dismissal of his constructive discharge and disability discrimination claims. Therefore, Ferrara has abandoned those claims and cannot seek to disrupt the District Court's judgment. *See In re Motors Liquidation Co.*, 590 B.R. 39, 67 (S.D.N.Y. 2018) (quoting *JP Morgan Chase Bank v. Altos Horno de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005)) ("arguments not made in an appellant's opening brief are waived even if the appellant . . . raised them in a reply brief").

prevail, or by demonstrating that the nonmoving party has failed to establish the existence of an essential element of the party's case on which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

The non-moving party must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A "party opposing summary judgment . . . must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor." *Doe v. Syracuse Univ.*, 457 F.Supp.3d 178, 193 (N.D.N.Y. 2020) (internal citations omitted). A "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials asserted in his pleadings . . . or on conclusory allegations or unsubstantiated speculation." *Id.* (citing *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994) and *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). If the non-moving party, who bears the burden of proof at trial, fails to raise a genuine fact issue as to any essential element of his claim, summary judgment should be granted because "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

Moreover, the "mere existence of a scintilla of evidence" in support of the non-moving party is insufficient to overcome summary judgment; rather, the non-

moving party must provide sufficient evidence that would allow a reasonable jury to render a verdict in its favor. *Anderson*, 477 U.S. at 252. Finally, while all reasonable inferences are drawn in favor of the non-moving party, summary judgment cannot be defeated "on the basis of conjecture or surmise," and instead, can only be defeated when the non-moving party "offer[s] some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal citations omitted).

## SUMMARY OF THE ARGUMENT

The District Court did not err by granting Kay's Motion for Summary Judgment on Ferrara's NYHRL/ADEA hostile work environment and retaliation claims because: (i) the District Court analyzed Ferrara's claims under a "severe or pervasive" standard and properly held that Ferrara produced no evidence to demonstrate that he was subjected to any severe or pervasive conditions that would alter his working conditions based on his age; (ii) Kay exercised reasonable business judgment to demote Ferrara based on his years of poor job performances under several supervisors; and (iii) Ferrara did not complain about any of Gullo's alleged comments until <u>after</u> being informed of his demotion. In fact, Ferrara's focus on mischaracterizing the District Court's opinion to argue that the District Court applied the incorrect standard of review underscores the lack of any record evidence necessary to establish a claim of a hostile work environment based on age.

It is undisputed that Ferrara performed poorly as a District Manager for several years under multiple supervisors who he never complained made any age-based comments toward him. It is also undisputed that, despite any age-based comments made toward him, Ferrara performed poorly across multiple supervisors, evidencing that any comments did not alter his working conditions. Ferrara has produced no evidence that demonstrates that he was subjected to any severe or pervasive conduct throughout his employment with Kay. Ferrara's demotion has no causal connection to any complaint about any age-based comments by Gullo and, instead, is entirely justified by Ferrara's poor job performance.

Accordingly, the District Court properly granted summary judgment in Kay's favor and its decision must be affirmed.

## LEGAL ARGUMENT

## POINT I

## THE COURT APPLIED THE CORRECT STANDARD OF REVIEW WHEN IT DISMISSED FERRARA'S HOSTILE WORK ENVIRONMENT CLAIM

This Court should affirm the District Court's ruling granting summary judgment and dismissing Ferrara's hostile work environment claim because the Court applied a "severe or pervasive" standard when it held that Ferrara did not produce sufficient evidence to demonstrate that he was subject to an age-based hostile work environment. Ferrara argues that the "district court applied the wrong

standard in asking whether the work environment was 'severe *and* pervasive'" and that the "test is severe *or* pervasive." (*See* Pb15.) However, the District Court adopted the correct test because it assessed Ferrara's evidence under <u>both</u> the "severe" and "pervasive" analyses, and determined that it was neither severe <u>nor</u> pervasive, thus meaning that it is not severe and/or pervasive. Ferrara's attempt to distract the Court by mischaracterizing the District Court's opinion highlights his failure to produce sufficient evidence to demonstrate that he was subject to an age-based hostile work environment. (*See* Pb15.)

At the outset, the District Court adopted the correct test for assessing Ferrara's hostile work environment claim because it explained in its Statement of Reasons that "to 'state a hostile work environment claim, a plaintiff must first demonstrate that []he experienced harassment 'sufficiently severe **or** pervasive to alter the conditions of [his] . . . employment and create an abusive working environment.'"" (Ja269). The District Court again explained that "in assessing whether the conduct is severe **or** pervasive enough to create a hostile work environment, courts must look to the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work.'"" (Ja270).

In fact, the District Court acknowledged that the comments were not severe enough to create a hostile work environment because they were "offhand, isolated

comments." (Ja273). Specifically, the District Court held that these comments were not severe enough because he "did not complain about the comments until after he was demoted, which occurred between six months and one year after Mr. Gullo allegedly began making them." (Ja273). The District Court also acknowledged that the comments were not pervasive enough because the comments were "occasional" and could not have "objectively impacted an employee so severely that they would have altered the conditions of [his] employment]." (Ja273).

Ferrara's argument (and entire basis of his appeal) that the District Court applied the incorrect standard is without merit and mischaracterizes the District Court's thoughtful Opinion and explanation about why no genuine issue of material fact exists that can demonstrate that Ferrara was subject to a hostile work environment. Therefore, the District Court applied the correct standard and held that the comments are neither severe nor pervasive, and as such, are not severe and pervasive.

## POINT II

## FERRARA HAS NOT DEMONSTRATED THAT ANY ALLEGED COMMENTS WERE SEVERE OR PERVASIVE ENOUGH TO VIOLATE THE NYHRL AND ADEA

As the District Court set forth, an age-based hostile work environment claim under both the NYHRL and ADEA requires that an individual "first demonstrate that she experienced harassment 'sufficiently severe or pervasive to alter the

conditions of her . . . employment and create an abusive working environment.'" (Ja269) (citing *Wheeler v. Bank of N.Y. Mellon*, 2018 U.S. Dist. LEXIS 131456, \*21 (N.D.N.Y. Aug. 6, 2018) (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)). In "evaluating a hostile work environment claim, a court must have some 'reason to believe' that the incidents it considers were 'motived by the plaintiff's [protected characteristics.'" (*Id.*) Plaintiffs must show whether the "harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." (*Id.*) (quoting *Rosenfield v. New York State Div. of Veterans' Affairs*, 2019 U.S. Dist. LEXIS 162633, \*45 (N.D.N.Y. Sept. 24, 2019)). Courts, when assessing whether conduct is severe or pervasive, will analyze the "totality of the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work." (*Id.*) (quoting *Gregory v. Daly*, 243 F.3d 687, 694 (2d Cir. 2001)).

For the reasons set forth below, this Court should affirm the District Court's holding that Ferrara failed to demonstrate that he was subject to an age-based hostile work environment.

**1. <u>Gullo's Alleged Comments Were Stray Remarks That Do Not Constitute Age Discrimination</u>**

Ferrara's age-based hostile work environment claim fails because he has failed to produce evidence that demonstrates that any Kay employee subjected him to any severe or pervasive conduct that altered his working conditions.

Incidents of alleged harassment "must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). "Our case law is clear that when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim." *Remy v. Marriott Int'l, Inc.* 952 F.3d 379, 388 (2d Cir. 2020). If the employee "does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the [employee's] employment[.]" *Davis-Garett*, 921 F.3d at 41 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)). Interference with an employee's work performance must be "more disruptive than a mere inconvenience or alteration of job responsibilities." *Ingrassia v. Health & Hosp. Corp.*, 130 F.Supp.3d 709, 720 (E.D.N.Y 2015).

The Court's decision in *Bunk v. General Services Admin.*, 408 F.Supp.2d 153 (W.D.N.Y. 2006) is applicable to the facts at hand. In *Bunk*, the Court granted summary judgment in an employer's favor when it held that the use of the term

"dinosaur" was insufficient to establish any discriminatory animus and could not serve as pretext to deny an employee a promotion. *Id.* at 159-60. There, the employee alleged that he was discriminated against based upon age when a younger employee was offered a promotion over him. *Id.* at 156. Identical to the case at bar, the employee initially filed a Charge with the Equal Employment Opportunity Commission ("EEOC"), but the EEOC "found no discrimination" and that the employer's "reasons for not promoting [the employee] were [not] mere pretext for age discrimination." *Id.* The employee alleged that the employer used the term "dinosaur" in reference to a co-worker's age, which the employer denied. *Id.* at 158. The Court emphasized that "[e]ven if these comments occurred, I do not believe they constitute sufficient evidence of discriminatory intent and are merely 'stray remarks.'" *Id.* Furthermore, the Court explained that "[s]tray remarks alone do not create an issue of material fact to defeat summary judgment." *Id.*

Ferrara cites to *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 46-47 (2d Cir. 2019) and *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 240 (2d Cir. 2007) to support his argument that "Gullo's barrage of ageist insults" supports his age-based hostile work environment claim. (Pb13-14.) However, neither case supports Ferrara's argument that he was subject to severe or pervasive conduct by any Kay employee.

For example, in *Davis-Garett*, the plaintiff alleged that she suffered from age-related discrimination from several other employees on a daily basis, including two of her supervisors and other co-workers, because she was not given the same preferential treatment as younger employees when the company relocated its employees and she was subject to age-related comments. 921 F.3d at 46-47. For example, the employee was forced to travel to a store 30 miles away from her home after her store closed, whereas the younger co-workers received assignments in closer locations. *Id.* Similarly, in *Kassner*, several employees made age-related comments toward the plaintiff. 496 F.3d at 240.

Here, Ferrara only alleges that one person, Gullo, made any comments related to his age, and he does not allege that any younger employees received any preferential treatment to him due to their ages.[2] (Ja032-033). In that regard, at the time of his demotion he claimed that Gullo called him a "dinosaur," told him that he was "hatched," that he did not know what it was like to be a "modern day manager" and a variety of other accusations. (Ja088). However, Ferrara never reported any of the alleged comments made by Gullo to Kay's Human Resources Department.

---

[2] Despite Gullo being the only alleged Kay employee to make any age-based comments toward Ferrara, Ferrara, at no point during discovery, noticed or subpoenaed his deposition. Instead, Ferrara has relied exclusively upon his unsupported allegations contained his untimely complaint that he made after his demotion. Ferrara's unwillingness to notice Gullo's deposition throughout the three years of this case is indicative of the deficiencies of Ferrara's claims against Kay. There is no evidence that creates any genuine issue of material fact that can demonstrate that Ferrara was subject to an age-based hostile work environment during his employment with Kay.

(Ja029-030; *see also* Ja084-087). Later, when Kay's Human Resources Department became aware and conducted an investigation into Ferrara's claims, it found that there was no discriminatory animus that motivated his demotion. (Ja030).

Ferrara argues that the District Court's ruling should be reversed because he vaguely asserted that Gullo made age-related comments toward him on "countless occasions"; however, Ferrara failed to utilize widely-accessible Company resources to timely report any alleged discrimination on any of these occasions. Ferrara failed to contact any Human Resources Department member and chose to wait to report any alleged misconduct until the time of his demotion to escape taking accountability for his poor job performance. Ferrara acknowledged that Kay offered a hotline for its employees to report any alleged harassing conduct and that he knew that only the Kay's Human Resource Department employees would receive any complaints. (Ja029-30). Yet, Ferrara failed to use Kay's hotline that is available to all of its employees, and instead, chose to wait until after his demotion to report any alleged misconduct. (*Id.*) Any alleged comments made by Gullo, including that Ferrara is a "dinosaur", even if true, amounts to nothing more than a "stray remark" which does not amount to a condition capable of creating a hostile work environment. Ferrara chose not to report any of the alleged "countless" comments to Kay's Human Resources, highlighting the lack of severity or pervasiveness of Gullo's alleged comments. *See Bunk*, 408 F.Supp.2d at 158.

Furthermore, Ferrara's bald assertion that Gullo's comments made his job conditions "worse" does not create any genuine issue of material fact that can show that he suffered from severe or pervasive harassment. Ferrara's working conditions did not change due to any animus based on age because he cannot show that his job performance significantly changed when Gullo became his supervisor. Ferrara alleges that no other employee aside from Gullo "made those comments" related to his age. (Ja032-033). Ferrara's deficient job performance was noted as far back as 2013, soon after he rejoined Kay, when he received a Performance Appraisal in February 2014, several years before Gullo became his supervisor in 2016, stating that his district performed at 7.3% below company expectations and that he needed to "get his team focused on standard performance and achievement." (Ja037-041). Ferrara regularly received negative performance evaluations from multiple supervisors for the duration of his employment and until his demotion in or around September 2017. (Ja037-083).

Ferrara's May 27, 2017 Employee Counseling Report noted that his district had only achieved 84.54% of company expectations, and that his district had only met company expectations in 2016 while underperforming in both 2015 and 2017. (Ja081-083). Ferrara struggled with his performance before and after the arrival of Gullo and he failed to meet Kay's expectations for all of its district managers since he rejoined Kay in 2013 until his demotion in or around August 2018. (*Id.*) Any

31

alleged harassment certainly cannot be the culprit for any decline in Ferrara's performance as a district manager, and there is no evidence in the record to show how his work experience was altered due to Gullo's alleged comments.

For these reasons, this Court should dismiss Ferrara's claim for age-based hostile work environment because he fails to provide any evidence that creates a genuine issue of material fact that may show that he was subject to any severe or pervasive treatment that altered the conditions of his employment.

## 2. Kay Would Be Entitled to the *Faragher/Ellerth* Defense Because Kay Took Remedial Action by Not Assigning Gullo to Supervise Ferrara After His Untimely Complaint

Even if this Court finds that Gullo's alleged comments may constitute severe or pervasive conduct, Kay is not liable to Ferrara because it took swift remedial action in his favor by not assigning Gullo to supervise his employment after his complaint.

The *Faragher/Ellerth* defense barring strict liability against employers for their supervisory employees' alleged creation of a hostile work environment is applicable when: (1) "the employer exercised reasonable care to prevent and correct promptly an [discriminatory] harassing behavior;" and (2) the employee "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Ferrara v. Kellwood Co.*, 440 F.3d 96, 102 (2d Cir. 2006) (quoting *Faragher v. City of Boca*

*Raton*, 524 U.S. 775, 807 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)) (alterations in original) (holding that an employer satisfied the *Faragher/Ellerth* defense because the employee failed to make a timely complaint despite the availability of a complaint mechanism).

Here, Ferrara argues that Kay is not entitled to the *Faragher/Ellerth* defense because he argues that Kay "produced no evidence that it undertook a good-faith and timely investigation into [his] allegations about the hostile work environment." (*See* Pb20).[3] Ferrara testified that he never spoke with anyone about any allegations of harassment until he spoke to Moghtader after learning about his demotion. (Ja030). Despite the untimeliness of Ferrara's complaint, it is undisputed that Ferrara, himself, admitted that Kay conducted an investigation into his complaint, and testified to the following:

> Q: And you indicated that I believe you told when you finally did make the complaint after your demotion to Kazam that you identified people for him to speak with who were also allegedly having issues.
>
> A: Yes.
>
> Q: And he did speak with them; correct?

---

[3] It is also undisputed that the NYSDHR itself conducted an investigation into Ferrara's allegation that he was subject to an age-based hostile work environment. However, it, too, held that "[o]ther than [Ferrara's] assertions, the investigation revealed no evidence of discriminatory animus," and that there was "insufficient evidence to support the allegations of discrimination because of age, opposed discrimination/retaliation, or disability." (Ja118-120). Furthermore, Kay "remained consistent" in evaluating Ferrara's job performance and these poor job performances "predated his complaints of discrimination by 3 years." (*Id.*) Ferrara's "own subjective belief, absent further proof, is insufficient to support a finding of discrimination." (*Id.*)

A:     I believe he did, yes.  They told me he did.

[(Ja030.]

Moghtader also acknowledged in e-mails with Ferrara that he was investigating Ferrara's allegations and concluded that his complaint was unsubstantiated.  (Ja030; Ja084-088).  Therefore, Ferrara has no basis to argue that Kay did not investigate his complaint against Gullo because Ferrara did not timely complain about the complaint and he, himself, admitted that Kay conducted an investigation. The fact that Ferrara did not agree with the outcome of the investigation is not evidence that a proper investigation did not occur.

Ferrara's argument that Kay is not entitled to the *Faragher/Ellerth* defense is also misguided because, despite the unsubstantiated nature of his complaint against Gullo, Kay took swift remedial action because Gullo never supervised Ferrara again after his demotion.  *See Ferrara*, 440 F.3d at 102 (permitting employers who take corrective action to shield themselves from strict liability).  Ferrara admitted that no other Kay employees made any age-based comments toward him.  (Ja032-033). Simply stated, Ferrara alleges that he complained about Gullo, and then Gullo never supervised him again.  As such, Kay cannot be strictly liable for any alleged age-based comments made by Gullo.

## POINT II

### FERRARA'S RETALIATION CLAIM ALSO FAILS BECAUSE KAY EXERCISED ITS OWN REASONABLE BUSINESS JUDGMENT BY DEMOTING HIM AFTER YEARS OF POOR JOB PERFORMANCE

#### A. Kay Had a Legitimate Business Reason for Demoting Ferrara

Even if Ferrara could establish a *prima facie* case for retaliation pursuant to the NYHRL and ADEA (which he can't), Ferrara's retaliation claim must also fail because he cannot show that Kay's legitimate, non-discriminatory reason for his demotion was a pretext for discrimination, especially when it came <u>before</u> his complaint about Gullo.

An employer may rebut a *prima facie* case of retaliation under the ADEA and NYHRL upon a showing that it had a legitimate, non-retaliatory reason for its adverse actions, which a plaintiff has the burden to rebut by showing that that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas S.W. Medical Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). For example, in *De la Cruz v. City of New York*, 783 F.Supp.2d 622, (S.D.N.Y. 2011), the Court held that an employee could not rebut his employer's non-discriminatory, legitimate reason for his demotion because of an "abundance of evidence supporting [the employer's] contention that [the employee] was demoted because of his poor work performance rather than his age." *Id.* at 643.

There was also no evidence that the employee "would have retained his position . . . had he been younger." *Id.*

Likewise, the ADEA and NYHRL do not allow courts to "sit as a super-personnel department that reexamines an entity's business decisions." *Scaria v. Rubin*, 17 F.3d 652, 655 (2d Cir. 1997). Even if employees fundamentally disagree with the conclusions of their supervisors, it is "not evidence that [their] supervisors' appraisals were a sham, invented to mask discrimination." *Gambello v. Time Warner Commc'ns, Inc.*, 186 F.Supp.2d 209, 224 (E.D.N.Y. 2002).

In *Saenger v. Montefiore Med. Ctr.*, 706 F.Supp.2d 494 (S.D.N.Y. 2010), the Court held that there was no evidence that undermined the credibility of an employer's decision to demote an employee when there was a long-standing history of performance issues. *Id.* at 509. The employee also failed, in the "fact of 'documented deficiencies in [his] job performance' to 'present any evidence that supports the existence of a discriminatory agenda towards older workers.'" *Id.* (quoting *Revere v. Bloomingdale's, Inc.*, No. 03 CV 5043, *8 (E.D.N.Y. Nov. 14, 2006)). *See also Cadet v. Long Island Coll. Hosp.*, No. 97-CV-1905, 1999 U.S. Dist. LEXIS 23582, *39 (E.D.N.Y. July 9, 1999) ("[P]laintiff's long disciplinary record of warnings issued by over ten supervisors . . . illustrates the weakness of any pretext argument"); *Duplan v. City of New York*, 888 F.3d 612, 627 (2d Cir. 2018) (offensive comments by hiring manager made early in the plaintiff's tenure did not support

claim that other decisions denying him promotions and/or demoting him created a retaliatory hostile work environment.)

Here, there is an overwhelming amount of evidence before his demotion and complaint showing that Ferrara had a long history of well-documented performance issues stemming from his time as a District Manager when he was overseen by two different supervisors. (Ja026-083). Ferrara's attempt to cherry-pick certain data mischaracterizes his years of poor job performance. (Pb25-27.) Until Ferrara's demotion, he never raised any complaints with the hotline offered by Kay, and he has never presented any evidence to date to challenge the validity of any of the performance evaluations he received prior to his demotion. In fact, he signed all of the evaluations and even provided some commentary agreeing with the observations made. (Ja037-083.) In particular, Ferrara responded to the November 8, 2016 Counseling Report authored by Gullo and acknowledged that they had "discussed some strategic plans that [he] understand[]s," and that he would "put into place the coaching ASAP." (*Id.*) Any alleged comments made by Gullo cannot amount to a showing that Ferrara's demotion was a pretext for age discrimination because of the overwhelming documentary evidence supporting Kay's business decision to demote Ferrara after several years of failing to meet the company's objective expectations.

Furthermore, Ferrara fails to provide any evidence, or even allege, that several of the individuals involved in the decision to demote him made any comments about

his age.   Stray age-related remarks are insufficient to raise an inference of discriminatory motive unless they were "made by supervisors who played a substantial role in the decision to terminate."  *Lively v. WAFRA Investment Advisory Group, Inc.*, 6 F.4th 293, 306 (2d Cir. 2021) (quoting *Naumovski v. Norris*, 934 F.3d 200, 216 n.47 (2d Cir. 2019)).  Stray remarks, "even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998).

Until Ferrara learned of his demotion, Ferrara never made a complaint to Kay, or anyone else, accusing Gullo, or any other employee, of subjecting him to any inappropriate comments prior to his demotion.  (Ja032-033).  Ferrara's demotion was recommended by several other employees, including Jennifer Hammond and Brian Watson; however, there are no allegations or evidence to show that they participated in any alleged discriminatory behavior.  (Ja256-258).  Here, there can be no doubt, then, that Ferrara's demotion was solely due to his performance issues because Ferrara fails to rebut Kay's legitimate, nondiscriminatory purpose for demoting him, and he cannot be subject to retaliation when his complaint came <u>after</u> his demotion.  For these reasons, Ferrara cannot show that he was subject to retaliation in violation of the NYHRL and ADEA and his claims for retaliation must be dismissed.

## CONCLUSION

For all of the reasons set forth herein, Kay respectfully requests that the Order granting summary judgment in its favor be affirmed in all respects.

Respectfully submitted,

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
*Attorneys for Defendant/Appellee*
*Sterling, Inc. d/b/a Kay Jewelers*

By:    <u>*s/ Steven J. Luckner*</u>
Steven J. Luckner, Esq.
Alexander W. Raap, Esq.
10 Madison Avenue, Suite 400
Morristown, New Jersey 07960
Telephone: (973) 656-1600
Facsimile: (973) 656-1611

Dated: September 20, 2023

## <u>CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE</u>
## <u>OF APPELLATE PROCEDURE 32(a)</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 8,867 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in the Times New Roman font, size 14.

**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**
*Attorneys for Defendant/Appellee*
*Sterling, Inc. d/b/a Kay Jewelers*

By:     <u>*s/ Steven J. Luckner*</u>
Steven J. Luckner, Esq.
Alexander W. Raap, Esq.
10 Madison Avenue, Suite 400
Morristown, New Jersey 07960
Telephone: (973) 656-1600
Facsimile: (973) 656-1611

Dated: September 20, 2023